**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| TAREK A. REED, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:   03-2657 (RMU) |
| | : | |
| v. | : | Re Document. No.:   41 |
| | : | |
| ISLAMIC REPUBLIC OF IRAN *et al.*, | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

GRANTING IN PART AND DENYING IN PART THE PLAINTIFF'S MOTION FOR
DEFAULT JUDGMENT

**I. INTRODUCTION**

The plaintiff in this matter is Tarek Reed, whose father was abducted, held and tortured by Lebanese terrorists over the course of three years. The plaintiff brings suit against the Islamic Republic of Iran and Iran's Ministry of Information and Security for their support of Hezbollah, the terrorist group that committed these acts. This matter now comes before the court on the plaintiff's motion for default judgment against the Islamic Republic of Iran. Because the plaintiff has shown that he is entitled to relief under the Foreign Sovereign Immunities Act, the court grants in part the plaintiff's motion for default judgment. Because the plaintiff is not entitled to relief under state law or international law, however, the court denies in part the plaintiff's motion.

## II. FACTUAL & PROCEDURAL BACKGROUND

### A. Factual Background

In the fall of 1986, Frank Reed was abducted in broad daylight.[1] Pl.'s Proposed Findings of Fact at 2. At the time, he lived in Beirut, a city that – despite its moniker as the Paris of the Middle East – had already known a decade of civil war. *See id.* While driving on a public thoroughfare to see his wife, Reed's path was cut off by three gunmen. *Id.* at 5. The gunmen abducted Reed and threw him into the back of a car, where he was driven to a hideout and subsequently held in captivity for the next several years. *Id.*

Immediately after his abduction, Reed's captors repeatedly interrogated and beat him, demanding to know if he was an agent of the Central Intelligence Agency. *Id.* at 5. During the following 1,330 days, Reed was subjected to routine torture. *Id.* at 6-7. Reed was kept in shackles and confined in a cell that was so small that he could not stand upright. *Id.* at 6. His health deteriorated, in part because his captors prevented him from receiving medical attention. *Id.* at 7. Reed was forced to wear a blindfold for so long that he suffered numerous eye infections. *Id.* He was subjected to electrocution, arsenic poisoning and countless beatings. *Id.* Nevertheless, Reed's greatest dread – in his words, "the worst thing that could happen to a man" – was the fear of dying alone. *Id.*, Ex. B. at 113.

Reed's ultimate fear never came to pass. He was eventually released to a hospital, where he remained for several months. *Id.* at 6-7. By the time he was released, it was clear that he was a changed man. *Id.* The color had leached from his hair and his meager diet had caused his body to atrophy. *Id.* Reed's doctors were never able to determine whether it was the beatings or the

---

[1] The factual background of Frank Reed's kidnapping has been recounted by the court in a number of previous Memorandum Opinions. *See Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998); *see also* Mem. Op. (July 17, 2006); Mem. Op. (Apr. 30, 2007).

poisoning that rendered him impotent. *Id.*, Ex. B, at 117.  To this day, Reed cannot walk. *Id.* at 7-8.  The repercussions of Reed's captivity have endured far beyond his release, as he has been repeatedly re-hospitalized for severe depression and post-traumatic stress syndrome. *Id.*

The plaintiff was only six years old when his father was kidnapped. *Id.*, Ex. C at 6. Throughout the years of Reed's detention, the plaintiff's mother never told the plaintiff that his father was kidnapped. *Id.*  In 1989, three years after Frank Reed was abducted, the plaintiff and his mother left Beirut and resettled in in Malden, Massachusetts. *Id.* at 13.

When Frank Reed was released from captivity, he promptly returned to the United States to rejoin his family. *Id.* at 8.  His behavior had changed drastically following his return, however. *Id.* at 8-10.  He started drinking excessively and rarely left his house. *Id.* at 14.  He could not walk, run or dance – activities he regularly enjoyed prior to his abduction. *Id.* at 16.

The plaintiff claims that he was deeply affected by his father's actions. *Id.* at 15.  Fellow students in school would taunt him for his father's increasingly erratic behavior. *Id.*, Ex. L at 7. The plaintiff suffers from chronic feelings of anger and frustration because of his father's condition. *Id.* at 16.  In addition, the plaintiff's academics were adversely affected by his father's return. *Id.*, Ex. M at 3.  According to the plaintiff, these academic difficulties affected him professionally and have limited his career choices. *Id.* at 9.  The plaintiff consumed significant amounts of alcohol and marijuana while a junior and senior in high school, a time period that coincided with many of his father's most severe psychiatric difficulties. *Id.* at 6.  The plaintiff attended a college part-time, but he dropped out due to chronic depression. *Id.*, Ex. M at 9.  The plaintiff states he continues to hold chronic feelings of helplessness and anger regarding his father's situation. *Id.* at 10.

3

### B. Procedural Background

The plaintiff initially filed suit against the Islamic Republic of Iran, Iran's Ministry of Information and Security ("MOIS"), the Iranian Revolutionary Guard Corporation and several high-ranking Iranian officials in December 2003. *See generally* Compl. In June 2005, the plaintiff filed a notice of voluntary dismissal as to the Iranian Revolutionary Guard Corporation and the individual Iranian officials. *See generally* Notice of Voluntary Dismissal (June 13, 2005).

After the defendants failed to appear or otherwise respond to the plaintiff's complaint, the Clerk of the Court entered default in July 2004. *See generally* Entry of Default (July 15, 2004). In January 2009, the court granted the plaintiff leave to file a second amended complaint to bring his claim under the recently enacted "state-sponsored terrorism" exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.[2] *See generally* 2d Am. Compl. The Clerk of the Court entered default against the remaining defendants as to the second amended complaint on April 20, 2010. *See generally* Notice of Default (Apr. 20, 2010). The plaintiff then filed a motion for default judgment, seeking judgment against Iran and MOIS for his claims under federal law, Massachusetts law and international law. *See generally* Pl.'s Mot. for Default Judgment ("Pl.'s Mot."). With that motion ripe for consideration, the court now turns to the relevant legal standards and the parties' arguments.

---

[2] The state-sponsored terrorism exception was previously codified at 28 U.S.C. § 1605(a)(7). This provision was repealed and replaced with 28 U.S.C. § 1605A in 2008. *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 18 (D.D.C. 2009).

### III.  ANALYSIS

**A.  Legal Standard for Jurisdiction Under the Foreign Sovereign Immunities Act**

The Foreign Sovereign Immunities Act presents the exclusive legal vehicle by which a plaintiff may bring suit against a foreign state.  *MacArthur Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 919 (D.C. Cir. 1987).  The FSIA "envisions a process for litigating against foreign powers that respects the independence and dignity of every foreign state as a matter of international law while providing a forum for legitimate grievances."  *Murphy v. Islamic Republic of Iran*, 778 F. Supp. 2d 70, 71 (D.D.C. 2011).  Among other things, the FSIA imposes numerous procedural hurdles to ensure that domestic courts will not harm foreign interests by failing to protect the foreign party against the swift entry of default judgments.  *See Sealift Bulkers, Inc. v. Republic of Armenia*, 965 F. Supp. 81, 84 (D.D.C. 1997).  Before addressing the merits of a plaintiff's claim, however, the court must first establish that it has personal jurisdiction and subject-matter jurisdiction.  *See Tenet v. Doe*, 544 U.S. 1, 5 n.4 (2005).  The court therefore turns to the necessary jurisdictional analysis.

**1.  Personal Jurisdiction**

In cases involving default judgment under the FSIA, personal jurisdiction exists if effective service of process has been made.  28 U.S.C. 1330(b); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002).  It is now clear that a plaintiff may effectively serve Iran in a default judgment case under the procedures set forth in 28 U.S.C. § 1608(a)(4).  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 69-70 (D.D.C. 2010).  Section 1608(a)(4) requires plaintiffs to request that the clerk of the court dispatch two copies of the summons, complaint and notice of suit (together with a translation of each into the foreign state's official language) to the Secretary of State, who then "shall transmit one copy of the

5

papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." 28 U.S.C. § 1608(a)(4); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 n.12 (D.D.C. 2008).

Here, the plaintiff has satisfied these requirements by requesting that the clerk of the court dispatch two copies of the summons, complaint and notice of suit (translated into Farsi) to the Secretary of State. *See generally* Certificate of Mailing (Oct. 9, 2009). The clerk of the court subsequently dispatched these documents to the Department of State, and the Secretary of State transmitted one copy of the documents to Iran via a diplomatic note through the Embassy of the Swiss Confederation while returning the other copy to the clerk of the court. *See generally* Return of Service & Aff. (April 1, 2010). The court therefore concludes that the plaintiff has properly served the defendants under § 1608(a)(4), and personal jurisdiction therefore exists. *Valore*, 700 F. Supp. 2d at 69-70.

### 2. Subject-Matter Jurisdiction

The FSIA confers subject-matter jurisdiction against foreign states only in certain limited circumstances. More precisely, the FSIA grants United States district courts subject-matter jurisdiction over (1) nonjury civil actions (2) against a foreign state . . . (3) as to any claim for relief *in personam*, (4) provided that the foreign state is not entitled to immunity.[3] 28 U.S.C. § 1330(a); *Valore*, 700 F. Supp. 2d at 64.

---

[3] In addition, a court only has subject-matter jurisdiction over claims that involve certain types of acts, including torture, extrajudicial killing, and hostage taking. 28 U.S.C. § 1605A(a)(2)(A)(ii); *id.* § 1605A(a)(1). Because the plaintiff's injury stems from a hostage taking, this matter falls squarely within the bounds of § 1605A(a)(1).

The court is satisfied that the first three prerequisites have been met in the present case. First, a default judgment proceeding under the FSIA is a nonjury civil action. *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 40 (D.D.C. 2002).

Second, Iran is a foreign state. *Valore*, 700 F. Supp. 2d at 64. With regard to defendant MOIS, the FSIA defines a foreign state to include "a political subdivision . . . or agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). MOIS is a political subdivision of Iran, and it may be treated as a state for the purpose of liability under the FSIA. *See Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 1, 7-8 (D.D.C. 2010); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 61 (D.D.C. 2003).

Third, as discussed *supra* Part III.A., the court has personal jurisdiction over the defendant as legal persons. Therefore, this is an action *in personam*, rather than *in rem*. *Peterson*, 264 F. Supp. 2d at 69-70. The fourth element requires further discussion, which is provided below.

Sovereign immunity is a common-law doctrine which generally dictates that foreign states may not be sued in U.S. courts. *See* Lee M. Caplan, *The Constitution and Jurisdiction over Foreign States: The 1996 Amendment to the Foreign Sovereign Immunities Act in Perspective*, 41 VA. J. INT'L L. 369, 377 (2001); *Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 133-35 (1812). The contours and scope of this common-law doctrine have been statutorily codified by the FSIA. *See generally* 28 U.S.C. § 1604; *Samantar v. Yousuf*, 130 S. Ct. 2278, 2284 (2010). Under the FSIA's conception of the doctrine of sovereign immunity, a foreign state is "presumptively immune" from suit. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1604.

The FSIA nevertheless contains certain enumerated provisions that strip foreign states of this immunity. *See* 28 U.S.C. §§ 1605-1607. Relevant here is the "state-sponsored terrorism" exception, which is codified at 28 U.S.C. § 1605A. Under this provision, sovereign immunity is waived only if: (1) the foreign state was designated as a state sponsor of terrorism both at the time of the act and the time when the claim is filed; (2) the claimant is a national of the United States; and (3) the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim, provided that the act occurred in the foreign state against which the claim is brought. *Id.* § 1605A(a)(2)(A)(i)-(iii).

The plaintiff's claim satisfies each of these conditions. First, the FSIA defines a "state sponsor of terrorism" as "a country the government of which the Secretary of State has determined . . . is a government that has repeatedly provided support for acts of international terrorism." *Id.* § 1605A(h)(6). Iran has been designated as a state sponsor of terrorism since 1983. *Valore*, 700 F. Supp. 2d at 67 (citing 49 Fed. Reg. 2836 (Jan. 23, 1984)). Iran still holds this designation. 22 C.F.R. § 126.1(d).

Second, the plaintiff was a national of the United States at all times relevant to this action. The prerequisites to United States citizenship are laid forth in 8 U.S.C. § 1401. The plaintiff is the child of one United States citizen and one alien. Pl.'s Proposed Findings of Fact at 13. To be considered a United States national in these circumstances, the plaintiff must first be physically present in the United States for a period of five years, with at least two years after he attained the age of fourteen. *Id.* § 1401(g). The plaintiff was born in Beirut in 1980; he moved to Massachusetts in 1989, where he has lived ever since. Pl.'s Proposed Findings of Fact at 13. Because the plaintiff has been physically present in the United States for more than

twenty-two years, (seventeen of which elapsed after he reached the age of fourteen), the court is satisfied that plaintiff is a national of the United States.

Third, the plaintiff is not required to afford the defendants an opportunity to arbitrate his claim. The FSIA requires that a claimant extend the foreign state an opportunity to arbitrate his or her claim, but this is only true if the defendant's acts occurred in the foreign state against which the claim is brought. 28 U.S.C. § 1605A(a)(2)(A)(i)-(iii). Here, the plaintiff's father was taken hostage in Lebanon, not Iran. Pl.'s Proposed Findings of Fact, Ex. B at 5-6. Because the offending act did not occur in the foreign state against which the claim is brought, the plaintiff is not required to afford the defendants an opportunity to arbitrate his claim. *See Valore*, 700 F. Supp. 2d at 68 (holding that the FSIA's third element was satisfied because the plaintiff was harmed in an attack that occurred in Lebanon, not Iran).

Because all three conditions have been met, the court determines that sovereign immunity poses no bar to the plaintiff's claim. *See* 28 U.S.C. § 1605A(a)(2)(A)(iii). Accordingly, the court concludes that it has subject-matter jurisdiction over the plaintiffs' claim.

### B. The Court Grants in Part and Denies in Part the Plaintiff's Motion for Default Judgment

#### 1. Legal Standard for Default Judgment Under the FSIA

Under the FSIA, a court cannot simply enter default judgment; rather, out of respect for the principle of sovereign immunity, it must ensure that the plaintiffs have established their claim or right relief by evidence that is satisfactory to the court. 28 U.S.C. § 1608(e); *Taylor v. Islamic Republic of Iran*, 2011 WL 3796156, at *3 (D.D.C. Aug. 29, 2011). Courts are therefore bound by a duty to scrutinize the plaintiff's allegations, and courts may not unquestioningly accept a complaint's unsupported allegations as true. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d

163, 171 (D.D.C. 2010).  In FSIA default judgment proceedings, the plaintiff may establish proof by affidavit.  *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002).

### 2. The Court Grants in Part the Plaintiff's Motion for Default Judgment Because the Defendants' Acts Would Trigger Liability for Intentional Infliction of Emotional Distress

The plaintiff argues that he is entitled to default judgment against the defendants because their acts would give rise to liability for the common-law tort of intentional infliction of emotional distress ("IIED").  Pl.'s Proposed Findings of Fact at 22.

The FSIA created a uniform standard of liability by "distilling general principles of common law liability and infusing them into a comprehensive federal cause of action." *Beer v. Islamic Republic of Iran*, 2010 WL 5105175, at *12 (D.D.C. Dec. 9, 2010).  Accordingly, a plaintiff proceeding under the FSIA must show that the defendants' acts would give to liability if viewed through the lens of tort law.  *Rimkus*, 750 F. Supp. 2d at 175.

An act that would otherwise constitute IIED gives rise to liability under the FSIA.  *See Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 13-14 (D.D.C. 2010).  The defendants' acts would give rise to an IIED claim if it (1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members.  *See* RESTATEMENT (SECOND) OF TORTS § 46.[4]

---

[4]  Courts assessing the extent of liability under the FSIA generally turn to the Restatement (Second) of Torts as an interpretive aide.  *See Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) ("*Heiser II*"); *see also Valore*, 700 F. Supp. 2d at 78-80 (D.D.C. 2010).  The Restatement also indicates that a plaintiff may not recover for IIED if they were not physically present to witness the harm done; nevertheless, other members of this court have concluded that this requirement is inapplicable for the purposes of the FSIA.  *Heiser II*, 659 F. Supp. 2d at 26-27; *Valencia*, 774 F. Supp. 2d at 14.  This is because "the function of the presence requirement – to ensure that a plaintiff actually suffered a high degree of emotional distress – is, in state-sponsored

The court is satisfied that the plaintiff has established each of the necessary elements of an IIED claim. First, an act of terrorism, such as the kidnapping and torture of Frank Reed, is by its very nature considered extreme and outrageous conduct. *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009) ("Acts of terrorism are by their very definition extreme and outrageous . . . ."). Indeed, terrorism's very *raison d'etre* is its "intent to create maximum emotional impact," particularly on third parties. *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000).

Second, this act was directed at the plaintiff's father. Pl.'s Proposed Findings of Fact at 23. Because the act was directed at someone other than the plaintiff, the plaintiff may recover for IIED. *Heiser II*, 65 F. Supp. 2d at 26.

Third, the court concludes that Iran and MOIS intentionally caused the terrorist act by giving material support and resources to Hezbollah for the kidnapping of Frank Reed. In *Cicippio v. Islamic Republic of Iran*, a member of this court concluded that Iran caused the terrorist attack at issue here by supplying Hezbollah with resources and material support. 18 F. Supp. 2d 62, 68 (D.D.C. 1998). This court takes judicial notice of the factual findings in *Cicippio* and reaches the same conclusion. *See Taylor*, 2011 WL 3796156, at *11 (observing that courts may take judicial notice of factual conclusions that are reached in related cases).

Fourth, the plaintiff meets the immediate family requirement because he is the son of Frank Reed. *Valore*, 700 F. Supp. 2d at 79 (concluding that one's "immediate family" includes one's spouse, parents, siblings and children). The court therefore concludes that the defendants'

---

terrorism cases, fulfilled by the horrific and terrifying nature of terrorism itself . . . ." *Valencia*, 774 F. Supp. 2d at 14. The court is inclined to agree and thus concludes that the Restatement's "presence requirement" need not be met in this case.

11

acts would give rise to tort liability for IIED. Because the defendants' acts would give rise to tort liability, the court concludes that Iran and MOIS must be held liable for the plaintiff's injury under the FSIA. *Valencia*, 774 F. Supp. 2d at 13-14.

### 3. The Court Grants the Plaintiff Compensatory Damages for His Economic Damages, Solatium and Pain and Suffering

The plaintiff seeks compensatory damages, economic damages and prejudgment interest.[5] *See generally* Pl.'s Proposed Findings of Fact at 26-30. The FSIA allows a plaintiff to recover "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c); *Valore*, 700 F. Supp. 2d at 83. To obtain damages, the plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate. *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003); *see also Valore*, 700 F. Supp. 2d at 83. For the reasons discussed above, the court readily concludes that emotional distress was reasonably certain to occur to the plaintiff when his father was abducted and tortured during his formative years. The court thus turns its attention to the plaintiff's estimate of his entitlement to damages.

---

[5] The plaintiff also asserts that the FSIA recognizes or incorporates a separate cause of action for solatium. Pl.'s Mot. at 23-24. Solatium is defined as "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent['s] society and comfort." *Murphy*, 740 F. Supp. 2d at 78. The FSIA defines solatium as a measure of damages, however, not as an independent cause of action. *See generally* 28 U.S.C. § 1605A(c); *see also Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 37 (D.D.C. 2001) (noting that § 1605A "clearly contemplates solatium recovery as a measure of damages, not as an independent cause of action"). The court therefore elects to recognize the plaintiff's solatium claim as a component of the defendants' damages. *Valore*, 700 F. Supp. 2d at 85; *Heiser II*, 659 F. Supp. 2d at 27 n.4.

### i. The Plaintiff Is Entitled to $2.5 Million in Compensatory Damages for Solatium and for Pain and Suffering

The plaintiff argues that a child whose parent has been abducted is entitled to an award of $1 million for each year that the parent was held hostage. *Id.* Because the plaintiff's father was held hostage for 1,330 days (approximately 3.65 years), the plaintiff seeks compensatory damages of $3.65 million for solatium and pain and suffering. Pl.'s Proposed Findings of Fact at 27.

The court is faced with an undeniable difficulty when asked to quantify the distress that results when a loved one is taken away. The court does not write on a blank slate, however; several other members of this court have faced this daunting task, and their efforts have established a framework to assist in the adjudication of these and similar claims. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 271-359 (D.D.C. 2006) ("*Heiser*"). Under the *Heiser* framework, a spouse, child, or sibling may receive $4 million, $2.5 million and $1.25 million, respectively, for valid claims in which the family member survived the terrorist act. *Id.* The framework has gained strong precedential support as other members of this court have repeatedly continued to follow it in FSIA cases. *See, e.g.*, *Brewer*, 664 F. Supp. 2d at 57-58; *Heiser II*, 659 F. Supp. 2d at 27 n.4; *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 113 (D.D.C. 2000); *Eisenfeld*, 172 F. Supp. 2d at 10-11; *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29-32 (D.D.C. 1998).

Because the court is cognizant of the fact that it must "take pains to ensure that individuals with similar injuries receive similar awards," *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 24, 54 (D.D.C. 2007), the court elects to adopt the *Heiser* framework. Under this framework, the plaintiff, a child of the victim, is entitled to $2.5 million in compensatory

damages. *See Heiser*, 466 F. Supp. 2d at 356-57. Accordingly, the court concludes that the plaintiff is entitled to $2.5 million in compensatory damages.

### ii. The Plaintiff Is Entitled to $2,035,000 in Economic Damages

The plaintiff also seeks $2,035,000 in economic damages to account for the plaintiff's diminished earning capacity. Pl.'s Proposed Findings of Fact at 28. The plaintiff has submitted expert testimony from Steven A. Wolf, a forensic economist, who calculated the plaintiff's total lifetime lost wages and benefits to be approximately $2,035,000 in its present-day value. *See generally id.*, Ex. M ("Wolf Report"). The plaintiff puts forth evidence to show that these lost wages and benefits are a result of his emotional distress, his chronic depression and the self-destructive behavior that was triggered by his father's kidnapping and subsequent behavior. *See id.* at 28-29.

The report of a forensic economist may provide a reasonable basis for determining the amount of economic damages in an FSIA case. *See Belkin*, 667 F. Supp. 2d at 24 (following a forensic economic expert's report in awarding $376,848 in economic damages). In this case, the Wolf Report bases its damages calculations on reasonable and well-founded assumptions, factoring in reasonable wages and benefits that the plaintiff might have earned over the course of his lifetime. Wolf Report at 9-10. The court therefore concludes that the plaintiff has proven to a reasonable certainty that he is entitled to $2,035,000 in economic damages.

### iii. The Plaintiff is Entitled to an Award of Prejudgment Interest

The plaintiff also seeks an award of prejudgment interest on his compensatory damages award. Pl.'s Proposed Findings of Fact at 29-30. "[C]ourts in this Circuit have awarded

prejudgment interest in cases where plaintiffs were delayed in recovering compensation for their injuries – including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 530 F. Supp. 2d 216, 263 (D.D.C. 2008); *see also Belkin*, 667 F. Supp. 2d at 24; *cf. Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 30 n.12 (D.D.C. 2011) (denying prejudgment interest in light of an award that exceeded the *Heiser* framework's valuation).  It has taken the plaintiff nearly a decade to pursue this suit against those who perpetrated his father's abduction.  Because of the nature of the plaintiff's loss and the considerable delay that is necessary to secure judgment, the court concludes that prejudgment interest is appropriate in this case.  *See Pugh*, 530 F. Supp. 2d at 263.  The prejudgment interest will be computed at a rate of six percent per annum on a simple interest basis from the date of the kidnapping (September 9, 1986) to the present.  *See Belkin*, 667 F. Supp. 2d at 24.

### 4. The Court Denies the Plaintiff's Motion for Default Judgment Inasmuch as It Seeks Relief Under State Law and International Law

The plaintiff also seeks default judgment for causes of action arising under state law and international law.  *See* Pl.'s Mot. at 21.  Prior to its amendment in 2008, the FSIA merely acted as a federal conduit for a plaintiff's state law or foreign law claims.  *Valore*, 700 F. Supp. 2d at 57.  Stated otherwise, the FSIA previously conferred federal jurisdiction over claims that a plaintiff had shown to be meritorious under state law or foreign law.  *Id*.  Congress amended the FSIA to provide "a uniform federal standard designed to hold rogue nations accountable for their promotion of terrorist acts."  *In re Terrorism Litig.*, 659 F. Supp. 2d at 85; *see also Belkin*, 667 F. Supp. 2d at 21.  Since then, § 1605A provides an exclusive cause of action under federal law.  *Valore*, 700 F. Supp. 2d at 57-58.  By enacting this provision, Congress intended to preempt

other channels for relief and to displace the varied and inconsistent causes of action that were previously cognizable under state and foreign law. *Belkin*, 667 F. Supp. 2d at 21 ("By providing for a private right of action and by precisely enumerating the types of damages recoverable, Congress has eliminated the inconsistencies that arise in these cases when they are decided under state law." (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 65-66 (D.D.C. 2008))).

In following the intent of Congress, therefore, the plaintiff's state law and international law claims must be dismissed. *See Beer*, 2010 WL 5105174, at *9 ("Permitting FSIA plaintiffs to bring state law causes of action under § 1605A would nullify Congress' expressed purpose and largely undermine the sea-change effected by the enactment of [§ 1605A]. Plaintiffs thus may not proceed with their state law claims in this action."). Accordingly, the court denies in part the plaintiff's motion for default judgment inasmuch as it seeks relief under state and international law.

## IV. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the plaintiff's motion for default judgment. In sum, the court awards the plaintiff $4,535,000, plus prejudgment interest of six percent annually. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued this 28th day of February, 2012.

RICARDO M. URBINA
United States District Judge